UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| TRAVIS CLINTON LENNON, | Case No. 17-cv-03437-LB |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION** |
| NANCY A. BERRYHILL, | |
| Defendant. | Re: ECF Nos. 17, 21 |

**INTRODUCTION**

Plaintiff Travis Lennon seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying his claim for disability benefits under Title XVI[1] of the Social Security Act.[2] He moved for summary judgment;[3] the Commissioner opposed the motion and filed a cross-motion.[4] Under Civil Local Rule 16-5, the matter is submitted for decision without oral argument. All parties consented to magistrate-judge jurisdiction.[5] The court grants

---

[1] Administrative Record ("AR") 97; Mot. – ECF No. 17. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Compl. – ECF No. 1 at 1.

[3] Mot. – ECF No. 17.

[4] Cross-Mot. – ECF No. 21.

[5] Consents – ECF Nos. 10, 11.

1    Mr. Lennon's summary-judgment motion, denies the Commissioner's cross-motion, and remands

2    this case for further proceedings consistent with this order.

3

4                                    **STATEMENT**

5    **1.  Procedural History**

6         On July 25, 2011, Mr. Lennon — who was born on March 5, 1992 — filed for supplemental

7    Social Security income benefits under Title XVI of the Social Security Act alleging an onset date

8    of March 5, 2010[6] and alleging disabilities of "Bi polar" and "mental health."[7] The Social Security

9    Administration denied the application initially and on reconsideration.[8] On May 23, 2012, Mr.

10   Lennon timely requested a hearing.[9] On March 22, 2013, Administrative Law Judge ("ALJ")

11   Maxine Benmour held a hearing in San Rafael, California.[10] Mr. Lennon and Linda Ferrer, a

12   vocational expert, testified.[11] ALJ Benmour held a supplemental hearing on August 2, 2013.[12] At

13   the supplemental hearing, medical expert Dr. Betty Borden testified by telephone,[13] and Mr.

14   Lennon and his mother testified in person.[14] ALJ Benmour issued an unfavorable decision on

15   October 21, 2013.[15]

16        The plaintiff asked the Appeals Counsel to review the decision. The Appeals Council denied

17   the request initially[16] but vacated its order on January 19, 2016 and remanded the case for further

18

19

20   [6] AR 321. Mr. Lennon's father, David Lennon, filed for benefits on Mr. Lennon's behalf.

21   [7] AR 150.

     [8] AR 202–07, 211–16.

22   [9] AR 225.

23   [10] AR 43.

24   [11] *Id.*

     [12] AR 73.

25   [13] AR 76.

26   [14] AR 82.

27   [15] AR 174–89.

     [16] AR 190–93.

28

proceedings and a new decision.[17] The grounds for remand were as follows. First, the ALJ's

decision did not address the claimant's mother's testimony and the father's report about the

claimant's symptoms.[18] In reaching this decision, the Appeals Council noted the claimant's "clear

longitudinal history of mental health symptoms with ongoing treatment" and an updated

November 2015 letter from the parents documenting "a continuation of troublesome symptoms.

These opinions should be evaluated pursuant to Social Security Ruling 06-3p."[19] Second, the

ALJ's decision improperly discounted the medical opinion of his long-term treating physician

John Leipsic on the ground that he had not seen the patient since March 2010.[20] The Council

observed that Dr. Leipsic's opinion showed the continuity and stability of the diagnosis of Bipolar

Disorder and Mr. Lennon's best (and current) medication response; it also was dated in 2013 and

thus apparently was based on records "during the period at issue, not only through the end of his

treatment,"[21] and — considered in the context of the record, including new records submitted with

the request for review — "show[ed] the perpetual and persistent nature of the claimant's

symptoms over the last decade."[22] The Council concluded, "Further consideration and

development of the claimant's condition is warranted."[23] The Appeals Council directed the ALJ to

do the following on remand:

- Obtain additional evidence concerning the claimant's mental impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 416.912-913). The additional evidence may include, if warranted and available, a consultative mental examination and medical source statements about what the claimant can still do despite the impairments.

---

[17] AR 194–98.

[18] AR 196.

[19] Id.

[20] Id.

[21] Id.

[22] Id.

[23] AR 196–97.

- If warranted and available, obtain additional evidence from a medical expert to clarify the nature and severity of the claimant's mental impairments (20 CFR 416.927(e) and Social Security Ruling 96-6p).

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide [a] rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the treating source opinion and third party opinions pursuant to the provisions of 20 CFR 416.927 and Social Security Rulings 96-2p, 96-5p, and 06-3p, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating source to provide additional evidence and/or further clarification of the opinion (20 CFR 416.912).

- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).[24]

ALJ Kwon ("the ALJ") held a new hearing on July 11, 2016[25] and issued an unfavorable decision on October 5, 2016.[26] Mr. Lennon asked the Appeal Council to review the decision.[27] On April 21, 2017, the Appeals Council denied his request for review.[28] Mr. Lennon timely filed this action on June 14, 2017 and moved for summary judgment.[29] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[30]

---

[24] AR 197.

[25] AR 290–94.

[26] AR 18–42.

[27] AR 16–17.

[28] AR 1–6.

[29] Mot. – ECF No. 17.

[30] Cross Mot. – ECF No. 21.

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 John Leipsic, M.D. — Treating

Dr. Leipsic was Mr. Lennon's sole treating psychiatrist for ten years from February 2000, when Mr. Lennon was eight, until March 2010, when he turned eighteen.[31] He is board certified in psychiatry and adolescent psychiatry, and at the time he submitted his letter on August 1, 2013, he was an Assistant Professor of Child Psychiatry in the Department of Pediatrics and Psychiatry at the University of Arizona Medical Center.[32] Dr. Leipsic began treating Mr. Lennon because of "challenging behaviors at home and school."[33] Dr. Leipsic diagnosed Mr. Lennon with a Bipolar Affective Disorder that remained stable from ages eight to eighteen.[34] Mr. Lennon had prior treatment since age three with a developmental pediatrician, who treated him for ADHD and anxiety.[35] The earlier diagnosis of ADHD and treatment with stimulants "dropped off as he reached upper adolescence.[36] "Records of his ten year medication tracking . . . demonstrate the challenge of these multiple medication trials and combinations."[37] Dr. Leipsic noted, "Most salient in the reading of his extensive treatment records is the continuity and stability of Travis'[s] diagnosis of Bipolar Disorder. Further, Travis'[s] medication response has been the best to dual antipsychotic mood stabilizers Seroquel and Abilify, a medication regime started in 2005, on which he remains to this day."[38] In his letter summarizing Mr. Lennon's treatment, Dr. Leipsic

---

[31] AR 803. Dr. Leipsic followed Mr. Lennon "from my private office, to the Children's Day Treatment Center, to his outpatient care at the County of Sonoma Mental Health until we transferred his care back to my private office." *Id.* Other records show some of Mr. Lennon's treatment and issues during this time period. *See, e.g.*, AR 795–802.

[32] AR 803, 863.

[33] AR 810.

[34] AR 803.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

stated, "As Travis Lennon's treating psychiatrist for ten years, I support his application for Social Security Disability Insurance and recommend he be qualified for SSDI."[39]

### 2.1.2 Sonoma County Department of Health Services, Mental Health Division — Treating

Until he moved to live with his father in Humboldt County in November 2010,[40] Mr. Lennon lived with his mother in Sonoma County and received care through Sonoma County.[41]

Sonia Beck, M.F.T., Ph.D., treated Mr. Lennon from 2009 to 2011.[42] In April 2010, Dr. Beck diagnosed Mr. Lennon with Bipolar NOS and listed his cannabis abuse.[43] In subsequent months, she met with Mr. Lennon and his mother, traveled to his school to assess him there, reported that he did relatively well on his prescribed medications of Abilify, Seroquel, and Wellbutrin, documented his difficulties (including his mother's asking him to leave for several days for not following the rules), coached him on his drug use (including the dangers of overdoing it), and talked with his teachers, among other interventions.[44] In October 2010, Dr. Beck assigned him a GAF of 53 and documented his deterioration, including his dropping out of his school, trying to find another school, and being asked to leave his mother's house.[45] In January 2011, Dr. Beck documented that Mr. Lennon had moved to Fortuna to live with his father and had begun to attend

---

[39] *Id.*

[40] AR 573.

[41] AR 443.

[42] AR 440–79. Dr. Beck's treatment was supplemented during this time period by Jasper Hollingsworth, M.D., who prescribed medications to Mr. Lennon. *See, e.g.*, AR 447.

[43] AR 477.

[44] AR 448–54.

[45] AR 448, 473. A GAF score purports to rate a subject's mental state and symptoms; the higher the rating, the better the subject's coping and functioning skills. See Garrison v. Colvin, 759 F.3d 995, 1002 n.4 (9th Cir. 2014) ("[A] GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'").

1  school there while maintaining his responsibilities and following the house rules set by his

2  father.[46] In January 2011, she assigned a GAF of 65.[47]

3       Other medical records show his prescriptions for Abilify, Wellbutrin, and Seroquel and Mr.

4  Lennon's appointments with Jasper Hollingsworth, M.D.[48]

### 2.1.3  Humboldt County Mental-Health Services — Treating

6       In November 2010, Mr. Lennon moved to Humboldt County to live with his father, and he

7  thereafter received care with various medical providers through Humboldt County's Department

8  of Health & Human Services, Mental Health Branch, from January 2011 through March 2015.[49]

9       Mr. Lennon met with Jeremy Nilsen, MFT, on January 4, 2011, with a follow-up school

10 observation on January 11.[50] Mr. Lennon was referred for an assessment about "whether mental

11 health symptoms related to 'emotional disturbance' [we]re interfering with the client's ability to

12 progress academically."[51] "Client records indicate that the client has displayed mood swings,

13 severe irritability, and decreased concentration."[52] Mr. Lennon reported use of marijuana one or

14 two times daily, which he said helped him concentrate.[53]

> Client records state that Travis has been designated as emotionally disturbed and
> historically had difficulty profiting from his Special Education program due to
> aggressive and impulsive behaviors in the classroom. Behavior problems in school
> reportedly began in the first grade, and these include extreme emotional sensitivity,
> difficulty with transitions, mood swings, aggression, and impulsivity. Client
> records also stated that the client has historically been depressed, has feelings of

---

[46] AR 443.

[47] AR 446.

[48] AR 447, 454.

[49] AR 443, 568–692, 823.

[50] AR 629–33. In addition to the medical opinions of the "acceptable medical sources," the ALJ must consider the opinions of other "medical sources who are not acceptable medical sources and [the testimony] from nonmedical sources." See 20 C.F.R. § 416.927(f)(1). "Other sources" include nurse practitioners, chiropractors, physicians' assistants, therapists, teachers, social workers, spouses and other non-medical sources. 20 C.F.R. § 404.1513(d).

[51] AR 629.

[52] Id.

[53] Id.

worthlessness, and flat affect. The client historically had a number of diagnoses, including ADHD, Depression, and Bipolar Disorder.[54]

During the County's observation of three classes (art, health, and physical education), Mr. Lennon worked on an art project, on task and well, followed the teacher's instructions to clean up, transitioned well into the health class, accepted a teacher's directive to put away his head phones, was at times uninterested but not disruptive, and was active in physical education.[55] A teacher reported that Mr. Lennon had not exhibited any significant behavioral problems, seemed to respond well to the school's flexible schedule, had worked on academics but had not turned in any work yet, and been irritable on two minor instances.[56]

Among other things, Mr. Nilsen recommended medication support to monitor Mr. Lennon's response to his current medication.[57] Mr. Lennon then met with Orm Aniline, M.D., on January 24, 2011.[58] In a check-the-box form that reflected his mental-status exam, Dr. Aniline observed that Mr. Lennon was peculiar (with careless grooming) in appearance, was evasive, guarded, and agitated (with poor eye contact) in his behavior, was normal in his psychomotor activity, was articulate and normal in his speech, was irritable and neutral in his mood, was full in his affect, and was organized and goal-directed in his thought form.[59] Dr. Aniline diagnosed Mr. Lennon with an impulsive disorder and assigned a GAF of 42.[60] Dr. Aniline continued Mr. Lennon's prescription for Seroquel and discontinued the Abilify.[61]

Mr. Lennon began meeting with Paula Edwalds, M.D., a psychiatrist, on June 28, 2011.[62] Mr. Lennon reported that he stopped taking his Seroquel in March and was using marijuana daily.[63]

---

[54] *Id.*

[55] *Id.*

[56] AR 629–30.

[57] AR 633.

[58] AR 601.

[59] AR 601–02.

[60] AR 603.

[61] *Id.*

[62] AR 596.

[63] *Id.*

Mr. Lennon's father reported that Mr. Lennon had been more depressed and angry over the past few weeks preceding the visit.[64] Among other observations in the check-the-box form that reflected her mental-status exam, Dr. Edwalds noted that Mr. Lennon was threatening, hostile, and uncooperative (with poor eye contact) in his behavior, was loud in his speech, and was angry in his mood.[65] Dr. Edwalds convinced Mr. Lennon to restart the Seroquel.[66] Her report reflects an Axis I diagnosis of Impulse Control Disorder.[67]

Mr. Lennon's father called Humboldt County Mental Health Branch on June 29, 2011.[68] He reported that Mr. Lennon was "upset at 'lo[]sing his cell phone' and that he is 'lo[]sing it' and 'bright red in the face.'"[69] He also reported that Mr. Lennon had moved in with him in November, 2010, that his son "gets out of control," and that he had "kicked his son out a few times since he's moved in with him for behavior issues."[70] The staff member who took the call "[s]trongly suggested that if his son got 'out of control and physically violent that [Mr. Lennon's father] call the police.'"[71] Mr. Lennon's father stated that he did not want to call the police for a welfare check because "he doesn't trust the Fortuna police and 'my son would see that as a betrayal.'"[72]

Over the course of the next several months, some of Dr. Edwalds's relevant observations are as follows. **September 19, 2011**: Mr. Lennon was calm and cooperative at their meeting,[73] was losing his temper less frequently, remained anxious in crowds, and was smoking marijuana daily; Dr. Edwalds increased his Seroquel dose (and noted that Mr. Lennon had already increased his

---

[64] *Id.*

[65] AR 596–97.

[66] AR 596.

[67] AR 595.

[68] AR 573.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] AR 587.

dose).[74] **December 5, 2011**: Mr. Lennon reported that his mood had been fairly stable on the medication, and Dr. Edwalds observed that he was well groomed, calm, and cooperative.[75] **March 13, 2012**: Mr. Lennon reported that Seroquel left him feeling sedated, and he slept too much, but he did not want to decrease his dosage.[76]

Mr. Lennon's father called Humboldt County Mental Health Division on May 2, 2012 and spoke with the resident nurse.[77] He reported that Mr. Lennon was having a meltdown because of his SSI application and asked to speak with Dr. Edwalds about what happened at Mr. Lennon's last appointment.[78] The resident nurse was unable to answer the father's question because Mr. Lennon had not signed a form allowing release of information.[79]

Dr. Edwalds saw Mr. Lennon on June 12, 2012.[80] Mr. Lennon reported irritability and ongoing mood swings.[81] Dr. Edwalds noted in her progress notes that Mr. Lennon displayed slowed thinking, smelled strongly of marijuana, and had an irregular sleep pattern.[82] Mr. Lennon asked to increase his dosage of Seroquel.[83] Her Axis I diagnoses were Impulse Control Disorder, Bipolar Disorder, and Cannabis Dependence.[84] She assigned a GAF of 40 and increased the Seroquel dosage.[85]

---

[74] AR 587, 589.

[75] AR 584.

[76] AR 579. Treatment records reflect separate visits with other medical professionals (such as a registered nurse) on the same schedule (and sometimes more) as the appointments with Dr. Edwalds. *See, e.g.*, AR 604–16. Overall, the records show visits from January 2011 to July 2013. AR 524, 780.

[77] AR 668.

[78] *Id.*

[79] *Id.*

[80] AR 665.

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] AR 667.

[85] *Id.*

On July 19, 2012, C. Amen, a senior resident nurse ("SRN"), performed the initial interview and observed in the progress notes that Mr. Lennon had an attitude, was angry, showed decreased weight, and was not in a receptive mood.[86] Dr. Edwalds noted that Mr. Lennon was sullen and irritable and that he reported that he was feeling better with the increased dosage of Seroquel.[87] Mr. Lennon reported "[l]ots of stress" including a temporary and unpleasant roommate staying with his father and the possibility that Mr. Lennon's father might relocate to Santa Rosa for work.[88] In her mental-status exam, Dr. Edwalds checked — among other boxes — uncooperative for behavior and angry and irritable for mood.[89] Dr. Edwalds assigned Mr. Lennon a GAF of 41.[90]

On October 9, 2012, Mr. Lennon reported to Dr. Edwalds that his father had moved out, and he was adjusting well to living on his own.[91] Dr. Edwalds noted in her "response to medications" report that Mr. Lennon's psychiatric condition was improving.[92]

Dr. Edwalds saw Mr. Lennon on December 11, 2012.[93] SRN C. Amen performed the initial interview and noted that Mr. Lennon was working odd jobs, had gained weight, was sleeping fine, and was cooperative though evasive when answering his mood assessment.[94] Mr. Lennon was not interested in counseling options.[95] Dr. Edwalds spoke with Mr. Lennon's mother, who reported that her son did well on Abilify in the past; Dr. Edwalds added that prescription and continued the Seroquel prescription.[96] She noted that Mr. Lennon was using marijuana daily, up to every 20

---

[86] AR 664.

[87] AR 661.

[88] *Id.*

[89] AR 661–62.

[90] AR 663.

[91] AR 658.

[92] AR 659.

[93] AR 653.

[94] AR 656.

[95] AR 653.

[96] AR 653, 655.

minutes, and her mental-status exam noted that he smelled like marijuana during the meeting.[97]
Her Axis I diagnoses was Impulse Control Disorder, Bipolar Disorder, and Cannabis Dependence,
and in her Axis IV diagnosis Dr. Edwalds noted that Mr. Lennon had "problems related to social
environment" and was "anxious in crowds."[98]

Mr. Lennon spoke with SRN C. Amen on February 4, 2013 and stated that he needed a refill
for his Seroquel and Abilify.[99] The SRN noted in the report that Mr. Lennon did not appear to be
compliant.[100] The SRN spoke with Dr. Edwalds, who authorized a one-time refill.[101]

Dr. Edwalds saw Mr. Lennon on March 7, 2013.[102] Mr. Lennon reported that his medications
were working well.[103] Mr. Lennon also reported that he had a new girlfriend, was feeling better
with Abilify, and was no longer breaking things or losing his temper as easily.[104]

On July 9, 2013, Mr. Lennon reported that he was having problems managing his anger[105] and
was managing to stay active by riding his bike and helping his uncle with yard work.[106] Dr.
Edwalds assigned Mr. Lennon a GAF of 46.[107] Her Axis I diagnoses remained Impulse Control
Disorder, Bipolar Disorder, and Cannabis Dependence.[108] Her Axis IV notes reflected that Mr.
Lennon was "living in poverty."[109]

---

[97] AR 653.

[98] AR 655.

[99] AR 785.

[100] *Id.*

[101] *Id.*

[102] AR 781.

[103] AR 784.

[104] AR 781.

[105] AR 777.

[106] *Id.*

[107] AR 779.

[108] AR 783.

[109] *Id.*

### 2.1.4 Sonoma County Department of Health Services, Mental Health Division — Treating

Mr. Lennon moved back to Sonoma County in June 2015 and resumed treatment through the County.[110] Accompanied by his mother, Mr. Lennon had an assessment interview on June 15, 2015 with Elizabeth Ehrmann-Subia, LMFT, and Mary Killian, LMFT.[111] He reported that he was couch-surfing with friends and periodically staying with his mother.[112] "He present[ed] as extremely agitated and uncooperative, and both he and his mom agree that this is his baseline."[113] Mr. Lennon declined referrals to counseling and the Department of Rehabilitation.[114] The assessment reflects his reporting of his present symptoms, including lack of motivation, indecisiveness, racing thoughts, impulsivity, difficulty sleeping, and anxiety symptoms such as excessive worrying, feeling easily tired, difficulty concentrating, irritability, and outbursts of anger.[115] He reported disliking people, anger, and frustration, and his resulting tendency to isolate himself.[116] His mother reported that he began drinking alcohol and smoking marijuana at age 16, and Mr. Lennon reported he used nitris (but was unsure when he did or when he last used it), and tried methamphetamine at age 20.[117] His mother reported the family's history of mental-health issues, including alcoholism on both sides, the recent ending of Mr. Lennon's almost-two-year relationship, the recent deaths of Mr. Lennon's friends, his daily use of marijuana, and his interest in building things and working on machines.[118] When the interviewers asked about work, Mr. Lennon reported that he was interested in working but did not want to have a boss, and he believed

---

[110] AR 822.

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] AR 823.

[118] AR 823–24.

that no one would hire someone without an education or work experience.[119]   The assessment

reflected his diagnoses of Bipolar Disorder (since his youth), Impulse Control Disorder, and

Cannabis Dependence (with heavy, daily use and withdrawal symptoms when not using).[120] It

documents his medications.[121] It summarizes his records beginning as a child, including in the

time periods 2010 and 2011.[122] The report concludes, "Client was angry and guarded. Client had

so much difficulty completing the assessment that his mother had to answer questions for him with

the stipulation that he make corrections if the information shared was inaccurate."[123]

     Mr. Lennon was referred to Ari Harrison, M.D., a board-certified psychiatrist. Dr. Harrison

saw him on July 13, 2015.[124] Dr. Harrison's report documented Mr. Lennon's medical history,

diagnoses, and medications.[125] He described his appearance: "yelling, angry self serving with

intense affect." [126] The diagnosis section reads: "mood do nos," "self reports bipolar," "self reports

adhd," "thc use d/o," and "pd nos".[127] The diagnosis section further states, "transitional age youth

with a life-long hostile temperament, insomnia, unhappy. Worse x years, but never in control.

numerous med trials — no clear efficacy."[128] It also reflects "thc active use" and "wanting only

meds at this time, but appears far more impaired and lacking resources."[129] Dr. Harrison

prescribed Seroquel and Clonidine.[130]

---

[119] AR 824.

[120] AR 823 (citing Humboldt County Records from 7/20/2014).

[121] *Id.*

[122] AR 835.

[123] AR 831.

[124] AR 835–36.

[125] AR 835.

[126] AR 836.

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] AR 837.

On August 6, 2015, Dr. Harrison performed a full 90-minute evaluation of Mr. Lennon.[131] The evaluation referenced medical records from Humboldt County in 2014 and Sonoma County from childhood and through 2010 and 2011.[132] It also includes documentation of a full reporting of Mr. Lennon's mental-health history and treatment in Sonoma and Humboldt Counties.[133] Mr. Lennon reported that he never took the Clonidine, did not want new medications, was continuing the Seroquel, was "doing a little better," and was less irritable.[134] Mr. Lennon's mother reported that there had been no outbursts for two weeks.[135] Dr. Harrison noted that Mr. Lennon's mood at the evaluation was tired, irritable, and sullen, and he continued to display poor impulse control, but relative to the last visit, he was improved.[136] Dr. Harrison increased the dosage of Seroquel.[137] Dr. Harrison's diagnoses were as follows: mood disorder; "self reports bipolar . . . [and] adhd;" THC use disorder, and a learning disorder.[138] He lists treatment goals that include building rapport, clarifying dx (which presumably means diagnosis), identifying the best rx (meaning, the best prescription), focusing on harm reduction, including trying for sobriety and decreasing caffeine, and tracking Kaiser labs.[139]

Dr. Harrison met with Mr. Lennon for 30 minutes on September 10, 2015.[140] His progress notes documented their interactions, including the following. Mr. Lennon felt calmer than he had

---

[131] AR 840–41.

[132] AR 842. The reference is to the years "200" to 2011 and includes specific references to 3/31/2010 and 8/27/2010. *Id.* From the context (including a reference to "kid", "200" is a typographical error that likely is 2000, which is the beginning of Mr. Lennon's treatment with Dr. Leipsic. *See supra*.

[133] AR 842.

[134] AR 841.

[135] AR 840–41.

[136] AR 843.

[137] AR 844.

[138] AR 843.

[139] AR 843–44.

[140] AR 845. Other evaluations took place during the visits. For example, the practice included targeted case management from Nadine Van Vraken Kemper, LCSW, on September 10, 2011, her subsequent briefing of Dr. Harrison, and the plan for another visit and thereafter a stepdown to transition Mr. Lennon to Kaiser. AR 849; *cf.* AR 848 (referencing Kaiser).

in prior months but still declined "offer of any services other than to continue meds."[141] Dr. Harrison's diagnosis and charting of Mr. Lennon's symptoms included earlier diagnoses but added "bipolar nos" (omitting the qualifying "self-reported").[142] Dr. Harrison noted that Mr. Lennon was less hostile on the higher dose of Seroquel but was still reactive and sullen with no goals.[143] It was unclear whether medication changes could improve Mr. Lennon's situation.[144]

Dr. Harrison met with Mr. Lennon and his mother for 30 minutes on October 5, 2015.[145] They reported that Mr. Lennon had no outbursts since their last meeting, spent his time at home, and avoided doing anything.[146] Mr. Lennon again refused case management or therapy.[147] Dr. Harris noted that the diagnosis "was uncertain — appears most consistent with bipolar spectrum with prior ODD and explosive temperament. [T]hc use present but almost certainly not causal. significant improvement [with] seroquel xr 600. unclear if med changes could improve situation."[148] Because Mr. Lennon declined additional services, it was "hard to justify TAY referral — which I think is otherwise clinically indicated. ? kaiser v. brookwood after next appt if situation unchanged."[149] The diagnosis included Bipolar nos, THC use disorder, and a learning disorder.[150] Dr. Harrison noted that Mr. Lennon smelled of cannabis and was in an irritable mood.[151] The report concluded, "pt at anticipated baseline and unwilling to engage in any [prescription] other than med management, despite [symptom] severity[;] we are left having to

---

[141] AR 846.

[142] AR 847.

[143] *Id.*

[144] AR 848.

[145] AR 850.

[146] *Id.*

[147] *Id.*

[148] *Id.*

[149] *Id.*

[150] AR 851.

[151] *Id.*

refer him back to Kaiser Psych."[152] Dr. Harrison said that he would make a six-week follow-up appointment as a safety net to avoid having Mr. Lennon fall through the cracks "but then will close once at kaiser."[153]

Dr. Harrison prepared a medical-opinion statement dated October 12, 2015 that reflected a start date for treatment of June 15, 2015 and the following diagnoses: Axis I: Bipolar NOS; and Axis II: Personality Disorder NOS.[154] He assigned a GAF of 51.[155] He said that the impairment would last at least twelve months, the patient was not a malingerer, and the patient was complaint with treatment.[156] Dr. Harrison identified the following diagnostically and clinically significant signs and symptoms for his diagnoses of Bipolar Disorder, ADHD, and Intermittent Explosive Disorder:[157] (1) **Bipolar Disorder**: (a) Criteria for a Manic or Hypomanic Episode: irritability, distractibility, agitation, impulsiveness, restlessness, and mood disturbance severe enough to cause noticeable difficulty at work, school, socially, or in relationships; and (b) Criteria for a Major Depressive Episode: depressed mood, irritability, loss of interest or pleasure in all/most activities, decreased ability to think or concentrate, restlessness or slowed behavior, feelings of worthlessness or guilt, and mood disturbance severe enough to cause noticeable difficulty at work, school, socially, or in relationships; (2) **Criteria for ADHD**: difficulty listening and/or following instructions, difficulty completing tasks, impulsivity, and inappropriate comments or physical gestures without regard for consequences; and (3) **Criteria for Intermittent Explosive Disorder**: difficulty controlling impulses that lead to aggressive behavioral outbursts (either verbal or behavioral), recurrent outbursts out of proportion to the magnitude of the stressor and without

---

[152] AR 852.

[153] *Id.*

[154] AR 854.

[155] *Id.*

[156] *Id.*

[157] *Id.*

thought to consequences, rage or irritability, shouting, and outbursts that cause impairments in functioning.[158]

For the impacts of the disability, Dr. Harrison checked the following: marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and repeated episodes of decompensation, each of extended duration.[159] He also checked the alternative "Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: . . . Repeated episodes of decompensation, each of extended duration."[160] The assessment reflects Mr. Lennon's prescribed Seroquel and answers "Yes" to the following questions: (1) does your patient use drugs or alcohol, (2) if so, would he still be disabled and unable to work if he stopped using drugs or alcohol, and (3) are your patient's mental limitations the direct result of his mental illness.[161]

Dr. Harrison completed a residual-functional-capacity assessment and found the following limitations in the following areas: (1) **Understanding and Memory**: a moderate limitation in the ability to understand and remember detailed instructions and no limitation in the ability to understand and remember very short and simple instructions; (2) **Sustained Concentration and Persistence**: (a) extreme limitations in the ability to carry to carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods; (b) a marked limitation in the ability to perform activities within a schedule, maintain regular attendance, and function within customary tolerances; and (c) mild

---

[158] AR 855–57.

[159] AR 858.

[160] *Id.*

[161] *Id.*

limitations in the ability to carry out short and simple instructions and make simple work-related decisions; (3) **<u>Social Interaction</u>**: extreme limitations in the ability to interact with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (4) **<u>Adaptation</u>**: (a) an extreme limitation in the ability to tolerate normal levels of stress; (b) a marked limitation in the ability to respond appropriately to changes in the work setting; (c) a moderate limitation in the ability to travel to unfamiliar places or use public transportation, and (d) a mild limitation in the ability to be aware of normal hazards and take appropriate precautions.[162]

Dr. Harrison's assessment was that Mr. Lennon would miss all days of work each month because of his mental impairment or for treatment of the mental impairment.[163] In response to the question, "Do you believe the patient can manage his own funds?", Dr. Harrison answered "No" and explained, "Too irritable, no skills."[164]

### 2.1.5 Kaiser Records — Treating

Mr. Lennon transferred back to Kaiser from Sonoma County services in November 2015.[165] On December 1, 2015, he saw Christine Bilbrey, M.D., a psychiatrist.[166] Her report noted his refusal for treatment other than medications, documented his prior medical history, identified his daily marijuana use (and his refusal to cut it back), reviewed his family history, reviewed his "systems" (such as cardiovascular, gastrointestinal, musculoskeletal, and neurologic systems, among others), documented her mental-status exam, discussed his lab results and other diagnostic studies, and documented her assessment and diagnosis.[167] She diagnosed Mr. Lennon with Bipolar

---

[162] AR 859–61.

[163] AR 861.

[164] *Id.*

[165] AR 876.

[166] AR 879.

[167] AR 880–82.

Disorder type I and continued his medication (albeit under a different brand name).[168] Mr. Lennon refused any other treatments, including a baseline EKG.[169] Mr. Lennon reported that he was doing well on Seroquel compared to past medications.[170] Mr. Lennon and his mother reported that his mood was much steadier and more stable following the increased Seroquel dosage that Dr. Harrison prescribed.[171] Dr. Bilbrey noted in her progress notes that Mr. Lennon had a history of "compulsive behaviors over the years with spending," but that it had become more controlled lately.[172] Mr. Lennon reported that his overall mood and energy were better as of late and that he was sleeping well.[173] Dr. Bilbrey observed that Mr. Lennon became more irritable with questioning and could not complete his psychological history, but she also was able to redirect his irritability (such that he was smiling by the end of the interview).[174] Mr. Lennon's attention and concentration were intact.[175] She scheduled once-a-month follow-up appointments and gave contact numbers for the clinic so that Mr. Lennon and his mother could call for earlier appointments "as needed."[176]

Mr. Lennon met again with Dr. Bilbrey on January 6, 2016.[177] Mr. Lennon and his mother reported that his mood was more stable since the last visit, and he reported that he had no major mood swings lately, other than intense anxiety that would come on suddenly.[178] Dr. Bilbrey noted that Mr. Lennon had a longstanding poor frustration tolerance.[179] Mr. Lennon reported feeling

---

[168] AR 882.

[169] *Id.*

[170] AR 880.

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] AR 881.

[175] *Id.*

[176] AR 882.

[177] AR 888.

[178] *Id.*

[179] *Id.*

tired when he took Seroquel, which allowed him to sleep.[180] Mr. Lennon was not interested in other treatment options or support at the time, and he raised his voice when the doctor recommended an EKG.[181] Dr. Bilbrey noted that Mr. Lennon's insight and judgment were chronically impaired.[182]

Mr. Lennon met with Dr. Bilbrey on March 23, 2016; Dr. Bilbrey noted his mood was relatively steady.[183] Dr. Bilbrey observed that he seemed calmer during the session because he showed no major outbursts and raised his voice only once.[184] Mr. Lennon claimed to have a verbal altercation with a neighbor because Mr. Lennon believed the neighbor was monitoring him with a cell phone.[185] Dr. Bilbrey thought that this was not a psychotic episode and that the neighbor was really trying to film Mr. Lennon.[186]

### 2.1.6    Richard Palmer, Ph.D. — Examining

Richard Palmer, Ph.D., a licensed psychologist, performed a psychiatric evaluation of Mr. Lennon on November 28, 2011.[187] His evaluation contains his general observations (including Mr. Lennon's friendly manner, good eye contact, and depressed facial expression),[188] Mr. Lennon's chief complaints (including ADHD, lack of focus, hyperactivity, impulsivity, irritability in crowds, and distractibility), and Mr. Lennon's reporting regarding the following categories: medication history (and current medication of Seroquel to sleep and focus), psychiatric history, drug and alcohol use (cannabis use since age 16, used that morning, and reported as medicinal), family history of mental illness (reported as none), medical history, family and social history

---

[180] *Id.*

[181] AR 888–89.

[182] AR 889.

[183] AR 898. Kaiser records show other records by providers such as Julie Mercer, MA, regarding prescriptions. AR 894.

[184] AR 898.

[185] *Id.*

[186] *Id.*

[187] AR 545.

[188] *Id.*

(including his girlfriend's dumping him the past Saturday and his couch-surfing and homeless status), educational history (through 10th grade), employment history, stressors, and his level of functioning (independent for basic activities of living, no help needed with meals, and able to manage finances).[189] The evaluation also reflects Dr. Palmer's mental-status examination, diagnosis, and functional assessment.[190]

Dr. Palmer's mental-status exam, among other things, noted Mr. Lennon's appearance (including good grooming), cooperative attitude, good eye contact, alert and fully oriented status, intact intelligence, adequate attention, good concentration, good calculation, good memory, intact ability to abstract, poor judgment, more insight, labile mood, logical and sequential thought process, and unremarkable thought process.[191] Dr. Palmer's Axis I diagnosis was Attention Deficit/Hyperactivity Disorder and Intermittent Explosive Disorder, and his Axis IV diagnosis noted the following: "Problems related to: Coping with psychological condition; unable to work; homeless; financial hardship."[192] He assigned a GAF of 50.[193]

Dr. Palmer's functional assessment was as follows:

> Based on the results of the requested mental status exam and clinical interview, including personal history and accompanying documents, it is my opinion that from a psychological standpoint alone, the following statements reasonably reflect Mr. Lennon's abilities:
>
> Given the assessment and diagnosis, Mr. Lennon currently:
>
> - Is questionably capable of managing funds as evidenced by a history of impulsivity and poor decision making.
>
> - Is able to adequately perform one or two step simple repetitive tasks and is able to adequately perform complex tasks as there are no noted intellectual impairments at this time.
>
> - Has a poor ability to accept instructions from supervisors and interact with coworkers and the public. There are significant social impairments at this time.

---

[189] AR 546–47.

[190] AR 547–50.

[191] AR 547–48

[192] AR 548.

[193] AR 549.

- Is able to perform work activities on a consistent basis without special or additional instructions as there are no noted intellectual impairments at this time.

- Has a poor ability to maintain regular attendance in the workplace as mental health symptoms will impact attendance.

- Has a poor ability to complete a normal workday or workweek without interruptions from a psychiatric condition as mental health symptoms will impact attendance.

- Has a poor ability to handle normal work related stress from a competitive work environment. Mental health symptoms will impact Mr. Lennon's ability to handle work related stress.

Given Mr. Lennon's psychiatric and treatment history and results of this evaluation, it appears that the mental health symptoms are chronic in nature. Given the current diagnosis and past mental health involvement, it appears that Mr. Lennon's current mental health condition may not abate on its own within a one year period. Mr. Lennon may benefit from starting therapy and starting psychiatric medication to address and manage current mental health symptoms. Overall Mr. Lennon's prognosis is guarded.[194]

### 2.1.7 Herbert Tanenhaus, M.D. — Examining

Herbert Tanenhaus, M.D., examined Mr. Lennon on May 1, 2013.[195] His evaluation contains his general observations (including Mr. Lennon's unkempt appearance, entering the interview with "*an attitude*,"[196] and increasing cooperativeness as the interview progressed), Mr. Lennon's chief complaints (anger and lack of trust), his prior diagnoses, his medical history (including being beaten into unconsciousness a year ago, resulting slower thinking[197]), his medication (Seroquel and Abilify, and his report that without his medication, "he punches walls"), his activities of daily living (lives in a shack with cooking facilities, heat, and water, prepares his own food, keeps the place clean, shops and showers every other day, and spends long periods of time in bed with his thoughts racing), his education and work history (including his being in special education, his

---

[194] *Id.*

[195] AR 763. Mr. Lennon's father accompanied him. AR 765.

[196] AR 766 (emphasis in original).

[197] This incident is reflected in the record at AR 680–84 and shows that Mr. Lennon was punched in the face and received sutures. Victor Wallenkampf, M.D., treated Mr. Lennon's wounds and concluded that no head CT was necessary because Mr. Lennon was neurologically intact.

desire to become a mechanic, and trimming of marijuana during the two-month season), and his use of marijuana (described by Mr. Lennon as daily use and medicinal).[198]

Dr. Tanenhaus's mental-status examination reflects the following: (1) Mr. Lennon's reported depressed mood and score of 38 on the Beck Inventory of Depression, warranting considering treatment with antidepressants; and (2) Mr. Lennon's cognition (alert and oriented, correct responses, recall after five minutes, adequate fund of information, and average intelligence).[199] He diagnosed Mr. Lennon as follows: Axis 1 (Mood Disorder; "I did not elicit a history of bipolar disorder"); and Axis II (Intermittent Explosive Disorder by history and reasonably controlled with medications) and ADHD.[200]

His diagnosis also stated the following:

His activities of daily living were unimpaired by his history.

He had no significant difficulty registering, understanding, recalling, and executing complicated constructions. However, he was unwilling to discuss certain areas of his life, when requested, as well as refusing to attempt to arithmetic problems.

His work history of trimming marijuana suggested a reasonable degree of competence in dealing with coworkers and with accepting supervision. However, his almost global mistrust of others suggested that he was capable of only limited contact with coworkers or with the public. He did not describe difficulty being in public when he shops.

In judging his impairments with concentration, persistence, and pace, his daily activities suggested some impairment in this area of functioning, perhaps due to lack of motivation, to work regularly.

Mr. Lennon is competent to manage his funds.

*Please note that this report of my psychiatric evaluation of Travis Lennon was based on a single interview. It should be considered as supplemental to other health information available to the division of disability determinations, which will make the final decision about the applicant's capacity for gainful employment based on their guidelines.* [201]

---

[198] AR 764–65.

[199] AR 766–67.

[200] AR 767.

[201] *Id*. (emphasis in original).

## 2.2    Other Records

### 2.2.1    David Lennon (Father) — Report

In October 2011, David Lennon submitted a "Third Party Function Report" that discussed Mr. Lennon's health conditions.[202] Mr. Lennon was living in a homeless camp at the time.[203] In describing Mr. Lennon's daily activities, David Lennon stated that Mr. Lennon would shower, play video games, and head out to see friends.[204] Mr. Lennon's condition affected his sleep, and Mr. Lennon needed reminders to maintain dental hygiene and take his medications.[205] Mr. Lennon sometimes had no appetite, and David Lennon would have to make sure that Mr. Lennon did not burn his frozen meals.[206] In response to the question, "[i]f the disabled person doesn't do house or yard work explain why not," David Lennon answered, "[c]an not stay focused more than an hour."[207] David Lennon reported that Mr. Lennon did not drive because "he won't study the written test," Mr. Lennon could leave the house on his own, Mr. Lennon did not shop often because he did not do well in crowds, and Mr. Lennon had no income.[208]

There were no places that Mr. Lennon went on a regular basis, and Mr. Lennon would sometimes need someone to accompany him to doctor appointments.[209] Mr. Lennon had problems getting along with others, and David Lennon gave the following examples: "he and his sister don't get along," and "if he makes a friend it will end in two or three months."[210] In the "Information About Abilities" section, David Lennon indicated that Mr. Lennon's condition affected the following categories: memory, completing tasks, concentration, understanding, following

---

[202] AR 360–67.

[203] AR 367.

[204] *Id.*

[205] AR 365.

[206] *Id.*

[207] AR 364.

[208] *Id.*

[209] AR 363.

[210] AR 362.

instructions, and getting along with others.[211] Mr. Lennon could pay attention for "one or two hours," did not finish things he started, did not follow written instructions, and had a "fair" ability to follow spoken instructions.[212] David Lennon reported that Mr. Lennon had never had a job and did not handle changes in routine well, and that he had not noticed any unusual behavior or fears in Mr. Lennon.[213] In response to the question "[h]ow well does the disabled person handle stress?," David Lennon answered, "[n]ot well at all he will cry or go into a sleep mode."[214]

### 2.2.2 Declaration of Michelle Lengjel and David Lennon

In describing Mr. Lennon's childhood, Mr. Lennon's parents wrote:

> By age 5 we had taken Travis to a doctor because of his behavior — he had horrendous tantrums, he couldn't sit still or do what he was told. We needed to get him help. He was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and put on Ritalin.

> By the 2nd Grade his medical care was transferred to a specialist, Dr. Leipsic, M.D. who treated Travis until age 18. At age 7, Dr. Leipsic diagnosed Travis with commencing Bipolar Disorder and ADHD. Even with medication and the care of specialists, he struggled daily and required our constant attention.

> At school he was frequently pulled out of classes and sent to the principal's office because of his disruptive behavior. At home, his tantrums included him pounding his head against walls and floors with great force, requiring us to physically restrain him in very tight "bear hugs." Even as a small child he didn't sleep at night and was constantly into things. We had to lock all interior and exterior doors at the top where he couldn't reach.

> Travis changed schools 3 times until he ended up at North Valley School which provided a therapeutic setting. There was a significant individualized attention for each student and they were allowed to physically restrain kids — which was a weekly occurrence for Travis.

> Unable to meet the demands of high school because of his mental illness and with no support from Humboldt County services, Travis dropped out of school by age 17. His illness and life have not improved since.[215]

Mr. Lennon's parents described Mr. Lennon's adulthood as follows:

---

[211] *Id.*

[212] *Id.*

[213] AR 361.

[214] *Id.*

[215] AR 402.

Travis is still highly volatile and quick to get upset about the simplest things. He has a tantrum at least once a day that lasts 20-30 minutes. These tantrums will happen when he can't find something, something of his is moved, the family dog bothers him or the doctor's office calls to schedule an appointment. In seconds he will start screaming, yelling and throwing things. There is no way to reach him or reason with him. When it's over he can't stay awake — he passes out. It's like his body goes into complete overload.

At least once a month Travis has tantrums that we call "episodes" because they are more intense and severe than his daily tantrums. His episodes have caused our neighbors to call the police 3 times since he moved back home in June. The most recent episode was triggered by me, his mom, turning off the TV believing he was done using it. Travis immediately began jumping up and down on his bed, screaming, throwing stuff against the wall and pounding his fists on the walls and yelling "stay away from me, don't come near me." He went downstairs and starting pacing and rubbing his head saying, "make it stop, make it stop." Eventually I got him in a bear hug, he calmed down and instantly fell asleep.

Travis is also deeply depressed all the time and multiple times a year he gets even more depressed and suicidal. Travis'[s] mood is never up, you'd never think of him as a happy person. And when he gets really depressed he feels deeply lonely. He'll ask himself, "why am I even here?" About a year ago, his sister was so concerned that she called the police to check on him when he was living in Humboldt County. We have both blocked his Face book on occasion because of the constant depressive thoughts and talk of suicide.[216]

Mr. Lennon's parents described his medications and side effects as follows:

Travis is terrified to go without his mediations. As the date of refill approaches his anxiety skyrockets — he's scared he'll run out of meds even though a refill requires just a phone call.

The most significant side effect we've seen is from the antipsychotic, Seroquel, which he's been on since the 4th or 5th grade. It makes waking up nearly impossible. It's hard for him to get up and then he's in a "fog" for about 1 to 2 hours — he can't really think or talk.

Travis also takes medical marijuana daily and we have seen how essential it is to his wellbeing. We have witnessed all of the following benefits: calmer/more relaxed, improved mood, and reduced anxiety. It is also essential to helping him sleep and improving his appetite. Without it his Bipolar Disorder is noticeably worse.

The medications help to stabilize Travis so that the highs and lows aren't as extreme but they have not, in any way, allowed him to live an even remotely normal or functional life.[217]

Mr. Lennon's parents described his concentration and focus as follows:

Ever since Travis was a baby he could not concentrate well or follow directions. And to make it worse, when he gets frustrated or confused he is immediately

---

[216] AR 403.

[217] *Id.*

overwhelmed and has to walk away. Once overwhelmed and frustrated, he'll almost never return to that task or topic, he'll abandon it completely or for months at a time.

We ask him to complete simple, household tasks like taking out the garbage, but, even with prompting he'll fail to complete it or forget all together. He can only stay on task for 15-20 minutes before getting distracted or needing to take a long break We have tried to get him working on a few occasions, but he never made it through even one day.

We've also noticed that he takes a long time to understand and process new information. He needs everything explained slowly and step by step. We recently had to fill out a release form and every detail had to be explained before he would sign it — this took 30 minutes.[218]

### 2.3    Mr. Lennon's Testimony

#### 2.3.1    March 22, 2013 Hearing

Mr. Lennon testified at the March 22, 2013 hearing before ALJ Maxine Benmour.[219] His last job was working in a school cafeteria around 2006.[220] Mr. Lennon testified that he dropped out of school because he was homeless, and school was "hard to do while being homeless."[221] Starting in second grade, Mr. Lennon was in special education at school.[222]  Mr. Lennon believed he was in special education "[b]ecause I was a bipolar child who blew up a lot and I needed — they needed to hold me down sometimes because of it."[223] Mr. Lennon later testified that this meant "[t]wo staff one on each arm and leg" and that this had happened since he was in the third grade.[224] Mr. Lennon was taking Seroquel and Abilify at the time of the hearing, but testified that the medication "helps but I still blow — I tend to blow up."[225] He explained that when he blows up: "I throw stuff. I punch walls. I can't control myself. I yell a lot."[226] Mr. Lennon had been living on

---

[218] AR 404.

[219] AR 47. The court summarizes Mr. Lennon's testimony at the March 22, 2013 hearing because ALJ Kwon said that she would review all the evidence in the record. *See* AR 96.

[220] AR 47.

[221] AR 48.

[222] *Id.*

[223] *Id.*

[224] AR 63–64.

[225] AR 50.

[226] AR 51.

his own for six months in Fortuna.[227] He testified that his episodes of throwing things and punching walls were better when he was alone.[228] Mr. Lennon believed that his "blow outs" had caused the recent end of a relationship, and that he would "flip out" around his friends which had led to fighting with them physically.[229]

Mr. Lennon had tried to find a job repairing dirt bikes, but he had been asked by stores if he had certifications, and he was not sure if he could get a certification because he did not know if he could put his mind to it.[230] He testified that he would spend his time helping out his "other Mom," riding his bike, and listening to music.[231]

### 2.3.1 August 2, 2013 Hearing

Mr. Lennon testified at a supplemental hearing before ALJ Maxine Benmour on August 2, 2013 in San Rafael, California.[232] Mr. Lennon testified that he had never had a job grooming marijuana plants and said he used marijuana daily to help him calm down, sleep, and to "help[] me to keep from exploding."[233]

### 2.3.2 July 11, 2016 Hearing

At the hearing before ALJ Kwon, in response to the ALJ's questioning, Mr. Lennon testified as follows. He was living with his mother, and he previously lived with his father for about a year or two in Humboldt County, stayed up there another five years, moved back, and moved in with his mother roughly a year and a half ago.[234] He left Humboldt because he was unsatisfied with the medical services he was receiving but he thought the services were tenfold better in Sonoma

United States District Court
Northern District of California

---

[227] AR 52.
[228] AR 53.
[229] AR 54–55.
[230] AR 56–57.
[231] AR 60–61.
[232] AR 73.
[233] AR 81–82.
[234] AR 99–100.

County.[235] For the five years he lived in Humboldt County, he had his own place, but his parents paid the rent.[236] He was in special-education classes his entire life, went through 12th grade, and never graduated.[237]  He was not confident in his reading abilities, believed he read at a 5th grade level, did not know math, and failed his driver's license test (apparently because he could not read).[238] He was seeing a mental-health specialist once a month (and had been for five months) for medications, had cognitive behavioral therapy as a child but not after age 18 because it did not help, and took Seroquel every day because it controlled his bipolar disorder (with symptoms that he described as explosions) and without it, he was unable to sleep.[239] He was uninterested in college courses, even as a hobby, because he was not able to graduate from high school, was horrible with books, and could last only five or ten minutes before flipping out because he could not handle being in public in general, and hid inside all day long.[240]

In a normal day, he did "[n]othing really, just lay there and do something and then if I do come across a task it don't last that long and it takes me pretty much the whole day to a week to finish."[241] He was able to feed himself (through microwaving, but he did not cook) and could dress and care for himself (although he sometimes went a week without showering because he found the whole world overwhelming and could not find the energy to shower).[242] He sometimes stayed in bed for a week.[243] He had one friend but never left his home for more than thirty minutes because his social anxiety and big crowds of people overwhelmed him.[244] His prescribed marijuana helped his anxiety, and he smoked it five to six times a day, depending on how stressful

---

[235] *Id.*

[236] AR 100.

[237] AR 101.

[238] AR 102.

[239] AR 104.

[240] AR 103–05.

[241] AR 106.

[242] *Id.*

[243] AR 106–07.

[244] AR 108.

the day was, but it did not allow him to leave the house but kept him from "slamming stuff and punching holes in the walls and stuff like that."[245] He was not able to take public transportation because it put him close to too many people; his mother drives him.[246]

For hobbies, Mr. Lennon liked working on motors (such as gas scooters and small motors) but lately had not because he had no energy.[247] His last job was a year and a half ago, through his father, who got him a job digging post holes, but he lasted only one day on the job,[248] flipping out because he was overwhelmed, felt pressured, and could not stay still for too long.[249] He generally did not shop but did previously (apparently in Humboldt, when he could walk to Safeway) at off hours such as 2:00 a.m., but sometimes it would take him three days to "prep" himself to go out shopping.[250] When he had a computer in the past, he sometimes would check Facebook.[251]

In response to questioning by his attorney, Mr. Lennon testified as follows. He flipped out or had an outburst "any day. It could be every day."[252] At school, they restrained him physically when he had an outburst, but he had learned to remove himself from a situation and walk away.[253] His cool-down period could sometimes take all day.[254] His bipolar disorder affected his sleep, he had problems sleeping all of his life, and smoking marijuana helped with sleep.[255] He woke up in a fog each morning at around 11 a.m. or noon; the fog could last for a few hours up to all day, and it made it very difficult to talk and think, and it "play[ed] into bipolar outbursts because I get

---

[245] AR 109–10.

[246] AR 111.

[247] Id.

[248] AR 111–12.

[249] AR 112–13.

[250] AR 114–15.

[251] AR 115.

[252] AR 118.

[253] Id.

[254] AR 119.

[255] AR 119–20.

frustrated because I don't know how to express myself that well."[256] He took all day to clean the house before his mother returned from vacation, and he could work on his scooter for roughly twenty to thirty minutes before he needed to take a break.[257]

## 2.4 Michelle Lengjel (Mr. Lennon's Mother) — Testimony

Michelle Lengjel — Mr. Lennon's mother — testified at the July 11, 2016 hearing.[258] In response to the ALJ's questions, she testified as follows. Travis lived with her for almost a year.[259] He previously lived in a rented room (that she paid for) with his uncle in Humboldt County but his uncle complained about his habits (including a dirty bathroom and kitchen and screaming inside his room) and couldn't take it anymore, so he moved back with her.[260] Mr. Lennon could dress, feed, and bathe himself.[261] She occasionally took Mr. Lennon grocery shopping around midnight, and Mr. Lennon went shopping himself only once every month or two.[262] Mr. Lennon has two friends who come to the house.[263] He worked on his Goped, a scooter with a motor on it, every two or three weeks if it had problems.[264] He saw a psychiatrist for medication and panics without it because "he knows what he'll be like if he doesn't take his medication."[265] His medication was Seroquel, and he used therapeutic oils and marijuana for anxiety, smoking three or four times a day.[266] She believed that Mr. Lennon's marijuana use was helpful because it replaced the Abilify:

---

[256] AR 120–21.

[257] AR 121–22.

[258] Ms. Lengjel also testified at the August 2, 2013; *see* AR 82–91. Her testimony was consistent with her testimony at the July 11, 2016 hearing.

[259] AR 124.

[260] AR 124–27.

[261] AR 127.

[262] AR 128–29.

[263] AR 129.

[264] AR 130.

[265] AR 133.

[266] AR 133–34.

"I've seen what he's been like on Abilify and what he's been like off the Abilify".[267] Marijuana helped relax her son's anxiety, tension, and panicking.[268]

Mr. Lennon spent his days listening to music or playing video games, and occasionally ("[n]ot very often . . . because it gets him upset"), he checked Facebook on his smartphone.[269] Ms. Lengjel prepared Mr. Lennon weeks in advance for medical appointments to mitigate his anxiety, using night tea among other efforts.[270]

In response to questioning by Mr. Lennon's attorney, Ms. Lengjel testified as follows. Mr. Lennon never had a therapist as an adult because he did not find them helpful as a child.[271] She remarked, "he's gotten all the therapy he could possible get [from age five] . . . [s]hov[ed] down his throat you might want to say."[272] By age three, Mr. Lennon was prescribed Ritalin, and by age eight, he was diagnosed with bipolar disorder and had been treated for it ever since.[273] She was worried that Mr. Lennon might hurt himself given his depression and the family history of bipolar disorder.[274]

### 2.5 Vocational Expert Testimony — July 11, 2016 Hearing

Jeffrey Malmouth, a vocational expert ("VE"), testified at the hearing on July 11, 2016 via telephone.[281] The ALJ noted that Mr. Lennon had no SGA.[282] The ALJ then posed the following hypothetical to the VE:

---

[267] AR 135.

[268] AR 140.

[269] AR 136.

[270] AR 137.

[271] AR 138–39.

[272] AR 139.

[273] AR 140–42.

[274] AR 143.

[281] AR 144.

[282] AR 145. "SGA" stands for substantial gainful activity, which is a part of the first step in determining disability. If the claimant has an SGA, then the claimant is "not disabled" and is not entitled to benefits. If the claimant has no SGA, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two, which looks to the severity of the claimant's impairment. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(ii).

"[L]et's assume we have an individual with the claimant's age, education, and background. Hypothetical individual does not have any restrictions from an exertional standpoint but has the following non-exertional limitations. The job should be limited to simple, routine tasks, equivalent to a maximum SVP of 2. There should be no interaction with the general public in terms of the primary duties of the job. There should be up to occasional interaction with the supervisor and no team work projects with other co-workers, again, as part of the primary duties of the job. I want to focus or narrow the range of jobs to those that an individual can perform pretty much after a simple demonstration certainly within 30 days and is performed regularly on their own so something that doesn't require coordination with others and being around lots of people. Can you give me three examples with numbers for California and the nation, please?"[283]

The VE replied:

"Yes . . . the first example I have would be an electrical accessories assembler. The DOT code is 729.687-010. This is light with an SVP of 2. Nationally there are approximately 37,000 jobs and in California approximately 4,400 jobs. A second example is a mail sorter. The DOT code is 209.687-026. This is light with an SVP of 2. Nationally there are approximately 50,000 jobs and statewide approximately 4,000 jobs. A third example is an inspector and hand packager. The DOT code is 559.687-074. Also light with an SVP of 2, nationally there are approximately 29,000 jobs and in California approximately 3,200 jobs. These are all light exertional strength. I have medium if you'd like as well."[284]

The ALJ then posed a second hypothetical:

"I added to my first set of restrictions that the hypothetical individual would be off task on a chronic basis. They are off task 25 percent of work time and this is happening every single day beyond the probationary period and so forth. What does that do to the representative three jobs and to competitive work in general?"[285]

The VE replied:

"Well, it would eliminate the three jobs that I discussed. It would also eliminate my opinion on all other jobs. If the individual were off task fully 25 percent of the day that means essentially that they would be unable to perform the essential functions of any job two hours, 25 percent off task is equivalent to two hours a day or a day in a quarter every week. I don't believe that that would be tolerated by any employer in a competitive labor market."[286]

The ALJ then asked the VE if his testimony was consistent with the DOT. The VE replied:

In part, Your Honor. The part about no public interaction, occasional supervision and no team work, that is based primarily on my experience. Also maybe to a lesser degree it's based on quantification of data, people, things in the DOT. With respect to the second hypothetical, being off task to 25 percent I would analogize that to a

---

[283] AR 145.

[284] *Id.*

[285] *Id.*

[286] *Id.*

level of absenteeism or to absenteeism on which there's actually then labor market surveys and in my opinion the amount of time off task would essentially equate to almost five days a month that the individual would be unable to perform the essential functions. For that particular piece of information I often turn to or rely on a publication, the Journal of Forensic Vocational Analysis where this labor market survey was published in support of my opinion on this particular issue.[287]

### 2.6 Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether Mr. Lennon was disabled and concluded he was not.[288]

At step one, the ALJ found that Mr. Lennon had not engaged in substantial gainful activity since June 29, 2011.[289]

At step two, the ALJ found that Mr. Lennon had the following severe impairments: "bipolar disorder, attention deficit hyperactivity disorder (ADHD), cannabis dependence, impulse control disorder, and intermittent explosive disorder."[290]

At step three, the ALJ found that Mr. Lennon did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.[291] Mr. Lennon's mental impairments, both individually and combined, did not meet or medically equal listings 12.04, 12.06, and 12.09.[292] Mr. Lennon's mental impairments also did not satisfy the "paragraph B" criteria because the evidence did not show at least two marked functional limitations or one marked limitation and repeated episodes of decompensation.[293] Mr. Lennon had only mild restrictions on activities of daily living (citing his activities of riding a bicycle, watching television, going on Facebook, riding and repairing a scooter, doing laundry, caring for his personal hygiene and grooming, and living alone in Humboldt County for a period of time that

---

[287] AR 145–47.

[288] AR 22–36.

[289] AR 23.

[290] *Id.*

[291] AR 24.

[292] *Id.*

[293] AR 25.

required him to be independent in shopping and cleaning).[294] He had moderate difficulties with social functioning (including disruptive and inappropriate behavior in school, emergency-room records of injuries suffered in altercations, and issues with crowds, irritability, anger and frustration) (but he also interacted with friends, girlfriends, and parents, showing some degree of ability to socialize with others); he also had moderate difficulties with "concentration, persistence, or pace."[295] Mr. Lennon's mental impairments did not satisfy the "paragraph C" requirements because the evidence did not show a history of chronic affective disorder that lasted at least two years causing more than a minimal limitation of ability to do basic work activities.[296] Mr. Lennon's impairments also lacked one of the following under "paragraph C": (1) repeated episodes of decompensation of extended duration; (2) a residual-disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement.[297]

At step four, the ALJ determined that Mr. Lennon had the residual-functional capacity ("RFC") to perform a full range of work at all exertional levels, with the following nonexertional limitations:

> [H]e is limited to simple, repetitive tasks equivalent to unskilled work with a maximum specific vocational preparation (SVP) of 2, no interaction with the public, and no team work projects with coworkers that requires coordinating with others; so that work is performed largely independently.[298]

The ALJ then found that Mr. Lennon had no past relevant work experience and proceeded to step five.[299]

---

[294] AR 24.

[295] *Id.*

[296] AR 25.

[297] *Id.*

[298] *Id.*

[299] AR 34–35.

At step five, the ALJ determined that, given Mr. Lennon's RFC, a significant number of jobs existed in the national economy that he could perform.[300] The ALJ concluded that Mr. Lennon was not disabled.[301]

## ANALYSIS

### 1.  Standard of Review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

### 2.  Applicable Law

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his

---

[300] AR 35.

[301] AR 36.

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

### 3. Application

Mr. Lennon contends that the ALJ erred at step five in determining his RFC because (1) the ALJ posed a hypothetical question to the VE that omitted the ALJ's limitations regarding his interactions with the public and co-workers, (2) the ALJ did not follow the Appeals Council's directive to ensure that the VE's testimony was consistent with the Selected Characteristics of Occupations ("SCO") (in addition to the Dictionary of Occupational Titles ("DOT")), and (3) the ALJ erred by giving only minimal weight to the medical opinion of his treating physician, Dr. Harrison.[302]

### 3.1 Whether the ALJ Erred in Formulating the Hypothetical Posed to the VE

Mr. Lennon contends that the ALJ erred by posing a hypothetical to the VE that did not reflect the final limitations the ALJ included in the RFC.[303] Specifically, Mr. Lennon alleges that the final RFC included a restriction from any interaction with the public and with co-workers, but the hypothetical posed to the VE stated only that the job should not include interaction with the public or co-workers as a "primary job duty."[304] For the reasons stated below, the court remands on this issue.

The ALJ assigned an RFC to Mr. Lennon that included "no interaction with the public, and no team work projects with co-workers that requires coordinating with others; so that work is performed largely independently."[305] In the ALJ's hypothetical to the VE, the ALJ stated: "[t]here should be no interaction with the general public in terms of the primary duties of the job. There should be up to occasional interaction with the supervisor and no team work projects with other co-workers, again, as part of the primary duties of the job. I want to focus or narrow the range of jobs to those that an individual can perform pretty much after a simple demonstration certainly

---

[302] Reply – ECF No. 22 at 2–3.

[303] Mot. – ECF No. 17 at 17.

[304] *Id.*

[305] AR 25.

within 30 days and is performed regularly on their own so something that doesn't require coordination with people or being around lots of people."[306]

The Ninth Circuit has held generally:

> A hypothetical question [to the VE] should set out all of the claimant's impairments. If the [RFC and] the "assumptions [upon which] the hypothetical are [based are] not supported by the record, the opinion of the vocational expert that claimant has a residual working capacity has no evidentiary value. The most appropriate way to insure the validity of the hypothetical question posed to the vocational expert is to base it upon evidence appearing in the record, whether it is disputed or not. . . . Unless there is record evidence to adequately support this assumption, the opinion expressed by the vocational expert is meaningless. [If] neither the hypothetical nor the answer properly set forth all of [the claimant's] impairments, the vocational expert's testimony cannot constitute substantial evidence to support the ALJ's findings.

*Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (internal quotation marks and citation omitted); *see Lubin v. Comm'r of Soc. Sec. Admin*, 507 Fed. Appx. 709, 712 (9th Cir. 2013) ("ALJ must include all restrictions in . . . the hypothetical question posed to the vocational expert"); *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) ("If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.").

The ALJ's final RFC arguably contains a stricter limitation on interactions with the public and co-workers than the restrictions the ALJ posed in her hypothetical to the VE because she added the words "primary duties of the job." Any error may be harmless for two reasons. First, the VE apparently interpreted the ALJ's hypothetical to mean no interaction with the public: when asked whether his testimony was consistent with the DOT, the VE replied, "The part about no public interaction, occasional supervision and no team work, that is based primarily on my experience."[307] Second, the government sets out the job duties for the three jobs that the VE identified.[308] The government argues persuasively that the job duties do not involve working with

---

[306] AR 145–46.

[307] AR 147.

[308] Cross-Mot. – ECF No. 21 at 5–6 & n.4.

people and instead involve working with things.[309] But Mr. Lennon counters that the jobs require taking instruction according to the SCO grouping "687," with 8 being the "People category."[310]

Given that the court remands to the ALJ for further weighing of the medical-opinion evidence, the court remands on this issue too. On remand, the ALJ can reconsider her hypothetical to the VE in light of the parties' arguments.

### 3.2    Whether the ALJ Erred by Failing to Ask the VE if His Testimony Was Consistent With the Selected Characteristics of Occupations

Mr. Lennon argues that the ALJ erred by failing to ask whether the VE's testimony was consistent with the Selected Characteristics of Occupations  ("SCO").[311] The Appeals Council ordered the ALJ to "identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p)."[312] Mr. Lennon argues that the ALJ's failure to ask explicitly about the SCO was error because the three jobs that the VE identified — electrical accessories assembler, mail sorter, and inspector and hand packager — require "Taking Instructions — Helping" under the SCO, and her RFC is not consistent with a job that requires taking instructions.[313] Mr. Lennon argues that the instructions involve interactions with the public or co-workers.[314]

Again, any error may be harmless. While the VE did not reference the SCO, he testified that the three jobs he identified — electrical accessories assembler, mail sorter, and inspection and hand packager — were consistent with the DOT and included "no public interaction, occasional supervision and no team work" based on the VE's experience."[315] But because the court remands

---

[309] *Id.* at 5–6.

[310] Reply – ECF No. 22 at 8.

[311] Mot. – ECF No. 17 at 18.

[312] AR 197.

[313] Reply – ECF No. 22 at 8.

[314] *Id.*

[315] AR 147.

for further weighing of the medical-opinion evidence, the ALJ can reconsider her hypothetical and questions to the VE and the parties' arguments on this issue.

### 3.3 Whether the ALJ Erred in Evaluating and Weighing Dr. Harrison's Medical-Opinion Evidence

Mr. Lennon contends that the ALJ erred when she assigned "minimal weight" to Dr. Harrison's opinion.[316] The ALJ's full discussion of the weight that she afforded Dr. Harrison's opinion is as follows:

> Dr. Harrison was of the opinion the claimant was unable to perform work activity on a sustained basis due to the emotional disorder. His opinion is based on a very short period of treatment from June 2015 through October 5, 2015 while the claimant has alleged an inability to work since March 2010. Thus, Dr. Harrison had no knowledge of claimant's emotional status since March 2010 and five months of treatment does not provide longitudinal knowledge supporting a loss of ability for all work activity. Minimal weight is given Dr. Harrison's opinion.[317]

The court first discusses the law governing the ALJ's weighing of medical-opinion evidence and then analyzes the medical-opinion evidence under the appropriate standard.

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); see also *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence."[318] *Ryan v. Comm'r of Soc. Sec.*,

---

[316] Mot. – ECF No. 17 at 19.

[317] AR 33.

[318] The Social Security Administration promulgated new regulations, including a new § 404.1521, effective March 27, 2017. The previous version, effective to March 26, 2017, governs based on the date of the ALJ's hearing, July 11, 2016.

528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians (and other "acceptable medical sources"): (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing Lester, 81 F.3d at 830).

An ALJ, however, may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); see also *Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An ALJ errs, however, when she "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for [her] conclusion." *Garrison*, 759 F.3d at 1012–13.

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the

frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

Dr. Harrison is a board-certified psychiatrist and therefore is an acceptable medical source.[319] He was Mr. Lennon's treating physician at Sonoma County Behavioral Health Department.[320] His opinion, including his conclusion that Mr. Lennon would miss all days of work per month due to Mr. Lennon's mental impairment, is contradicted by Dr. Tanenhaus's opinion.[321] The ALJ therefore was required to give "specific and legitimate reasons" for rejecting his opinion. *Garrison*, 759 F.3d at 1012.

Mr. Lennon challenges the ALJ's according minimal weight to Dr. Harrison's medical opinion on the ground that five months of treatment in 2015 did not provide "longitudinal knowledge supporting a loss of ability for all work activity" for a claimant who alleged an inability to work since 2010.[322] He also argues that the ALJ erroneously referenced Dr. Harrison's lack of "knowledge of the claimant's emotional status since March 2010. . . ."[323]

Preliminarily, the length of the treatment relationship is relevant. The Social Security Administration regulations instruct ALJs to consider the "[l]ength of the treatment relationship

---

[319] AR 862.

[320] AR 835–61.

[321] AR 767.

[322] Mot. – ECF No. 17 at 24 (quoting AR 33).

[323] *Id.*

and the frequency of examination" as one factor in assigning weight to medical opinions, explaining:

> Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source.[324]

*See also Lusardi v. Astrue*, 350 Fed. Appx. 169, 171–72 (9th Cir. 2009) (holding that the ALJ satisfied the clear and convincing standard when they assigned minimal weight to a treating physician's opinion because the ALJ noted the doctor's infrequent visits with the claimant); *Puga v. Colvin*, No. 13–cv–03485–JSC , 2014 WL 2452699, at *8 (N.D. Cal. May 30, 2014) (upholding the ALJ's decision to assign minimal weight to a treating physician because the ALJ considered a decrease in the claimant's treatment schedule with the treating physician); *Grande v. Colvin*, No. 5:14-cv-05181-PSG , 2015 WL 7454154, at *4 (N.D. Cal. Nov. 24, 2015) (reasoning that the ALJ could assign less weight, but not completely reject, a treating doctor's opinion because the doctor's relationship with the patient had only lasted five months).

Furthermore, the Ninth Circuit has noted, "Section 404.1502 neither explicitly forbids nor requires crediting a physician 'treating' status whose patient contact is thus limited. Its language suggests that 'a few times' or contact as little as twice a year would suffice, but it does not state that this frequency of patient contact represents a floor." *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035–36 (9th Cir. 2003). "Rather, the standard it applies is that the claimant must have seen 'the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).'" *Id.*

Here, the record reflects that Dr. Harrison's treatment was part of a team approach that included assessments by other Sonoma County mental-health providers in 2015.[325] His reports

---

[324] 20 C.F.R. § 404.1527 (c)(2)(i).

[325] AR 840–53; *see supra* Statement (summarizing the Sonoma County Mental Health Division records).

show his review of records from Humboldt County and earlier Sonoma County record dating back to 2010.[326] He conducted a full mental-health assessment in August 2015.[327] Mr. Harrison's mother was there and with Mr. Lennon, provided his full history.[328]

Given that the County's mental-health assessment took place over a treatment period that spanned June to October 2015 and was based on a full assessment that included Dr. Harrison's review of Mr. Lennon's full medical history and records from childhood, the ALJ's cursory explanation for according the opinion minimal weight was not a "specific and legitimate" reason for rejecting it, especially given the ALJ's giving significant weight to the 2013 one-time examination by Dr. Tanenhaus.[329] *Garrison*, 759 F.3d at 1012–13. The court remands for the ALJ to reconsider the medical opinion.

## CONCLUSION

The court grants Mr. Lennon's summary-judgment motion, denies the Commissioner's cross-motion, and remands this case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: July 26, 2018

_____
LAUREL BEELER
United States Magistrate Judge

---

[326] AR 842.

[327] AR 840–41.

[328] AR 841–42.

[329] AR 32.